# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KATIE ARNETTE STRAIGHT

        Plaintiff,

v.                              CIVIL ACTION NO. 1:10CV33
                                       (Judge Keeley)

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on February 25, 2010, the Court referred this Social Security action to United States Magistrate Judge David J. Joel with directions to submit proposed findings of fact and a recommendation for disposition.

On September 2, 2010, Magistrate Judge Joel filed his Report and Recommendation ("R&R"), which directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within fourteen (14) days after receiving service of the R&R. On September 16, 2010, plaintiff, Katie Arnette Straight ("Straight"), through counsel, Michael G. Miskowiec, filed objections to the R&R. On September 20, 2010, Assistant United States Attorney Helen C. Altmeyer filed a response to the objections. This matter is now ripe for decision.

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

---

## I.  PROCEDURAL BACKGROUND

On October 3, 2007, Straight filed for disability insurance benefits, alleging disability since August 30, 2005. The Commissioner denied the claim initially on March 7, 2008, and on reconsideration on May 19, 2008. An Administrative Law Judge ("ALJ") held a hearing on January 21, 2009 at which Straight, represented by a non-attorney representative, appeared and testified. On August 27, 2009, the ALJ issued a decision finding Straight was not entitled to a period of disability. Following a request for review, on January 26, 2010, the Appeals Council denied Straight's request for review and the ALJ's decision became the final decision of the Commissioner. On February 25, 2010, Straight timely filed this action seeking judicial review of the final decision.

## II.  PLAINTIFF'S BACKGROUND

As of August 30, 2005, the onset date of Straight's alleged disability, she was twenty-two (22) years old, and, pursuant to 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009), is considered a "younger person," under the age of 50. Straight has at least the equivalent of a high school education and an employment history as a senior

accounts payable technician, file clerk, administrative assistant and dispatcher.

### III. ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1. Straight met the insured status requirements of the Social Security Act through December 31, 2010;

2. Straight has not engaged in substantial gainful activity since August 30, 2005, the alleged onset date;

3. Straight's severe impairments, fibromyalgia, psoriatic arthritis, obesity, and a depressive disorder, do not, alone or in combination, meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526);

4. Straight has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that does not require any crawling, climbing of ladders/ropes/scaffolds, more than occasional balancing, stooping, kneeling, crouching or climbing of ramps/stairs, concentrated exposure to extreme cold/heat, vibration, fumes, odors, dusts, gases, poor ventilation or hazards (machinery, heights, etc.), or more than simple, unskilled tasks;

5. Straight is unable to perform any of her past relevant work (20 CFR § 404.1565);

3

6.   Straight is considered a younger individual age 18-49 as of the alleged disability onset date (20 CFR § 404.1563);

7.   Straight has at least the equivalent of a high school education and is able to communicate in English (20 CFR § 404.1564);

8.   Straight's transferability of skills is not material to the determination of disability because the Medical-Vocational Rules support a finding of not disabled (20 CFR § 404.1568);

9.   Based on Straight's age, education, work experience and residual functional capacity, there are a significant number of jobs in the national economy that she can perform (20 CFR §404.1569 and 404.1569a); and

10.  Straight has not been under a "disability," as defined in the Social Security Act, from August 30, 2005 through the date of the ALJ's decision (20 CFR 404.1520(g)).

## IV.   OBJECTIONS

Straight contends that, after determining her depressive disorder was a severe mental impairment, the ALJ erred in relying on the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, App. 2 ("grids") to deny her claim for disability benefits. The Commissioner contends that the ALJ properly relied on the grids at step five of the sequential evaluation process and further contends that both of the unpublished and non-precedential cases relied on

by Straight in her objections are distinguishable from this case. Moreover, the Commissioner also contends that, because Straight's objections fail to raise any argument not previously made, the Court should apply the clear error standard of review it uses when no objections are filed.

## V.   MEDICAL EVIDENCE

In summary form, the medical evidence in the case includes the following:

1.   A September 22, 2005, obstetric discharge summary indicating Straight gave birth to a son with no postpartum or operative complications;

2.   A June 3, 2006, City Hospital, Inc. emergency room note indicating complaints of severe heartburn for the past eight months following her pregnancy. Curt Cackovic, D.O. examined Straight and recommended she avoid alcohol, caffeine, nicotine, chocolate, and fatty foods, sleep with the head of the bed elevated, avoid eating within three hours of going to bed, and follow-up with her treating physician;

3.   An August 29, 2007 City Hospital, Inc. laboratory report indicating negative RA factor, ANA, and sedimentation rate;

4.    An August 29, 2007 office note following an initial visit by Cherry B. Lobaton, M.D., who became Straight's treating physician, indicating a complaint of multiple joint pain, especially in her knees, ribs and back and bilateral swelling in her knees. Straight reported that the pain is worse when walking, that her knees crack when she walks and that her mother has RA and fibromyalgia. She requested and received a refill of her Omeprazole;

5.    A September 5, 2007 office note from Dr. Lobaton indicating an assessment of hyperlipidemia and low fat, low cholesterol dietary counseling;

6.    An October 1, 2007 evaluation note by Michael M. Rezaian, M.D., a rheumatologist, indicating Straight reported pain, stiffness, and swelling in her lower back on both sides present for the past nine years, which has worsened in the last few years. Physical examination revealed swelling and tenderness, mostly on the left side of her wrists, proximal interphalangeal joints (PIPs), and metatarsophalangeal joints (MTPs), tenderness in her metacarpophalangeal (MCPs) and her hips over the left trochanteric bursa, tenderness in her shoulders and ankles, more on the left side, left sided swelling and tenderness in her knees, and tender

elbows with no swelling. Dr. Rezaian diagnosed sacroiliac joint inflammation with fibromyalgia, prescribed Fexemid for the fibromyalgia, recommended x-rays of the sacroiliac and lumbar spine and a follow-up appointment in six months;

7.   An October 10, 2007 x-ray report from City Hospital Radiology Services report regarding the sacroiliac and lumbar spine indicating no bone abnormalities, well-maintained interspaces, normal sacroiliac joints, and normal lumbar spine;

8.   A January 8, 2008 note from Dr. Rezaian indicating complaints of increasing pain in both the upper and lower extremity joints and spine. Dr. Rezaian diagnosed psoriatic arthritis, fibromyalgia, and trochanteric bursitis. Physical examination revealed nails with pitting, PIPs and MCPs with tenderness on both sides with no swelling, wrists with tenderness on both sides, elbows tender on both the right and left, shoulders with tenderness on both sides, C-spine with significant fullness and tenderness in the distribution of trapezuis, S1 with much tenderness on both sides, hips with bilateral side tenderness, knees with bilateral tenderness on both sides with no swelling, ankles with tenderness but no swelling, and MTPs with much tenderness but no swelling. He recommended continuing Fexmid, Nexium, and Ultram, and adding

Voltaren. He noted that her condition was "much worse compared to before;"

9.    A January 9, 2008 City Hospital, Inc. laboratory report indicating negative RA factor, ANA, and sedimentation rate;

10.   A January 15, 2008 note from Dr. Rezaian indicating a Straight reported a smaller increase in pain and swelling in the upper and lower extremities, morning and rest stiffness, no new complaints of joint pain or stiffness, more pain and stiffness with weather changes, no new complaints of diarrhea or constipation, and no side effects from the current treatment.  His impression was "overall she is getting better as to the last evaluation."  His diagnosis was psoriatic arthritis, fibromyalgia, inflammation in the sacroiliac joints, low positive ANA from psoriatic arthritis not Lupus, improved knee joint swelling, and worsening trochanteric bursitis. His plan was to stop the Volteran and Ultram as currently prescribed, start treatment of her pain with Ultram to be taken only as prescribed, and begin treatment with steriods for diagnostic purposes.  He recommended exercise on a regular basis to help with stiffness, pain and to prevent de-conditioning, weight loss, and a follow-up appointment in four weeks;

11.  A January 22, 2008 emergency room report from City Hospital, Inc. indicating complaints of cough and shortness of breath for a month and a half.  Straight reported that "she has been so busy that she has not been able to see a physician for evaluation or treatment." Dr. Ellis diagnosed bronchitis and prescribed azithromycin in the form of a Z-pak, Robitussin with codeine, Albuterol metered dose inhaler and a follow-up with Dr. Lobaton;

12.  A February 12, 2008 office note from Dr. Lobaton from a follow-up appointment for bronchitis and indicating complaints of decreased appetite, diarrhea, chest pain and tingling in fingers. Straight reported that she still had the cough but feels better and believes the coughing causes the diarrhea, vomiting and decreased appetite;

13.  A February 12, 2008 routine abstract form - physical from Dr. Lobaton referencing an August 29, 2007 examination for multiple joint pain and a referral to Dr. Rezaian. Physical examination on February 12, 2008 revealed normal gait and station, normal fine motor ability in her hands, normal gross motor ability, no presence of any muscle atrophy, tenderness in her neck, knees, and chest wall - rib cage, normal reflexes, motor strength, coordination, and

mental status, normal respiratory and normal heart sounds, no edema, and no problems with extremities or circulation. Dr. Lobaton diagnosed GERD, obesity, and fibromyalgia but found no record of a diagnosis of lupus;

14. A February 14, 2008 Department of Health and Human Resources Medical Review Team Physician's Summary with an illegible signature indicating a diagnosis of fibromyalgia, psoriatic arthritis, a poor prognosis, ability to lift five to ten pounds on occasion, ability to sit twenty to thirty minutes at a time, ability to stand twenty minutes, difficulty bending and ability to walk twenty minutes. It further noted that Straight could sit in a classroom if permitted to stand up and move around when needed, did not participate in community or volunteer work and was not a candidate for gainful employment;

15. A May 14, 2008 physical residual capacity assessment from Fulvio Franyutti, M.D., a State Agency Medical Consultant, indicating Straight could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8 hour workday, and sit about 6 hours in an 8 hour workday, no limitations for reaching in all directions (including overhead), no limitations for handling (gross manipulation), no limitations for fingering

(fine manipulation), and no limitations for feeling. He found that she was able to perform household duties and care for her son, could drive, and could perform light work with restrictions to avoid exposure to extreme cold, heat, fumes, odors, dusts, gases, poor ventilation and hazardous machinery. Dr. Franyutti noted that Straight was partially credible and further noted that he disagreed with Dr. Rezaian's statement that "she is not a candidate for gainful employment;"

16. A July 28, 2008, office note from Dr. Rezaian indicating complaints of usual aches and pains, morning stiffness, pain and stiffness with weather changes, dry eyes, dry mouth, no diarrhea, no constipation, no rash, no itching, difficult getting to sleep and staying asleep, fatigue and tiring easily, no recent injuries or accidents. Physical examination revealed PIPs with bilateral swelling and tenderness, MCPs with tenderness but no swelling, wrists with swelling and tenderness on both sides, elbows with tenderness mainly on the right side, shoulders with tenderness, C-Spine with tenderness in the distribution of trapezius, S1 tenderness on both sides, hips with tenderness, bilateral tenderness and swelling in the knees, swelling and tenderness in both ankles, and MTPs with swelling and tenderness on both sides.

11

Dr. Rezaian prescribed Methotrexate tablets for her psoriatic arthritis, recommended weight loss to help with pain and to slow the progression of her arthritis and a follow-up appointment in two months;

17. An August 25, 2008 daily activities questionnaire completed by Straight indicating that she: lives with her mother and son, does not help her mother with the chores due to her pain, does the grocery shopping only when her mother is unable to do it, does not drive to her doctor appointments unless her mother is unable to take her, does not cook except to heat up T.V. dinners or make a sandwich, needs assistance getting in and out of the shower, spends the day in a recliner watching television, enjoys reading non-fiction books and biographies, has occasional visits from friends who live in Virginia, handles her own finances and pays bills, has an active driver's license, sleeps in her recliner and usually goes to sleep around 5:00 a.m. and sleeps until her son wakes her around 10:00 a.m.. She stated that when she worked she had good attendance, arrived on time, did not require frequent breaks or rest periods, maintained her work routine, was able to concentrate on her work for long periods of time, and got along "great" with her co-workers and supervisors;

12

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

18. An November 13, 2008 office note for a routine examination from Dr. Lobaton indicating Straight's psychiatric evaluation was positive for anxiety, depression, stress and insomnia, was negative for sadness, had appropriate affect and demeanor, had normal speech pattern, and had a grossly normal memory. Dr. Lobaton recommended a graduated exercise program, weight loss, to stop smoking and a follow-up visit in four months. Physical examination revealed a moderately obese, well-groomed female in no apparent distress, normal range of motion of the neck with no thyromegaly and no carotid bruits, clear lungs, regular heart rate and rhythm with no murmur, rub or gallop, normal gait, normal range of motion of all major muscle groups, pain with range of motion in shoulders, back and hips, 5/5 muscle strength in all major muscle groups, normal overall tone spine with no scoliosis or other abnormal spinal curvatures, intact cranial nerves, motor and sensory function, reflexes, gait and coordination;

19. A November 25, 2008 office note from a follow-up examination with Dr. Rezaian indicating a chief complaint of hurting "a lot on left side." Dr. Rezaian diagnosed psoriatic arthritis, ankle joint swelling, hand joint swelling, wrist joint swelling, trochanteric bursitis, back muscle spasm, epicondylitis,

generalized stiffness, sacroiliac joint inflamation, psoriasis, depression, and headaches. Dr. Rezaian noted that Straight appeared "to be getting worse compared to before," that hot showers, baths, or heat appeared to improve her symptoms, that her psychiatric mood and affect was normal and appropriate to the situation, and that she was oriented to person, place, and time. Physical exam revealed a current weight of 237 pounds, blood pressure of 106/61, pulse of 65, no apparent distress, no skin rashes, subcultaneour nodules, lesions or ulcers, normal station and gait, normal mood and affect, good coordination, normal touch and pin sensations, and normal deep tendon reflexes.

Dr. Rezaian recommended local steroid injections, Ketoprofen, and nonsteroidal anti-inflammatory drugs as needed. He stated that Straight may need treatment disease modifying drugs (DMARDs) if her arthritis becomes worse. He recommended Ambien for insomnia, continuation of the Percocet because "it is helping with her pain and has no serious side effects," weight loss and a regular exercise program to help with pain and maintain muscle tone;

20. A December 10, 2008 office note from a follow-up examination with Dr. Rezaian indicating no change in her symptomatology after discontinuing her treatment with Methotrexate,

unchanged swelling in ankles, hands and wrists, unchanged psoriatic arthritis, active psoriasis, generalized stiffness worsening TMJ, and an overall physician global assessment that "she appears to be getting worse compared to before."  Dr. Rezaian recommended a possible need for disease modifying drugs if her arthritis worsens, continuation of Percocet, weight loss, a regular exercise program, and Cymbalta for depression;

21.  A December 10, 2008 form completed by Dr. Rezaian for the West Virginia Department of Health and Human Resources (DHHR) indicating a diagnosis of psoriatic arthritis, fibromyalgia, and trochanteric bursitis and a prognosis of "fair." Dr. Rezaian noted that he expected Straight's incapacity and disability to be permanent, that she did not need someone to stay in the home with her on a continuous basis, and that she was able to care for children under age six.  He determined Straight could lift up to 15 pounds occasionally, sit and stand for up to one hour, walk as tolerated, and was not a candidate for employment or a class room setting;

22.  A January 20, 2009 office note from a physical examination with Dr. Rezaian indicating psoriatic arthritis unchanged and active, steroids did not help, back pain at night

from sacroiliac joint inflammation that improves with activity, and a physician global assessment of "overall she does not seem to have made much progress either way compared to before." Physical examination revealed a weight of 234, blood pressure of 112/79, pulse of 77, no skin rash, subcultanrous nodules, lesions or ulcers, normal gait and station, muscle strength 5/5 for all groups tested, normal muscle tone, mood and affect normal and appropriate to situation, oriented to person, place and time, good coordination, normal touch and pin sensations, normal and symmetrical deep tendon reflexes, DIPs with no tenderness or swelling and normal range of motion, PIPs bilateral tenderness and fullness, MCPs tenderness but no swelling and maintained overall range of motion, tenderness on both sides of wrists with good range of motion, tender on right and left sides of elbows with range of motion within normal limits, tenderness on both sides of shoulders with unchanged range of motion, significant fullness and tenderness in the distribution of the trapeziums with good range of motion, bilateral tenderness and swelling in the knees and ankles, and bilateral side tenderness in hips with good range of motion.

Dr. Rezaian recommended treatment with Topamax, continuation of Percocet for pain, weight loss reduction through an increase in

activity and reduction of calorie intake, a regular exercise program to help with pain and to help maintain  muscle tone and prevent de-conditioning, and no treatment with DMARDs due to no evidence of active synovitis at this time,;

23.  A January 20, 2009, note from Dr. Rezaian to "To Whom It May Concern" indicating Straight was under his care for psoriatic arthritis, and that due to her current medical condition, she is "not a candidate for gainful employment;" and

24.  A February 26, 2009, mental status examination report from Harry W. Hood, M.S., a State Agency psychologist, indicating Straight reported her chief complaints as psoriatic arthritis, fibromyalgia, lupus, and trochanteric bursitis. Straight reported that, her medications slowed down her thinking and memory, and "she cannot do tasks."

Hood reported:

> Mental Status Examination: Appearance: The claimant is an overweight, young woman with observed mobility impairments and a need to stand frequently related to reported back pain. Attitude/Behavior: Cooperative. Speech: Speech was clear. Orientation: Present x4. Mood: Mood appeared depressed. Affect: Affect was generally broad with several instances of crying. Thought Process: Stream of thought was well organized.  Thought Content: No evidence of delusions, phobias, or obsessions was seen.

> Perceptual: Illusions or hallucinations were not present. Insight: Insight was fair. Judgment: Judgment was average, based on a correct response to the question of the lost letter. Suicidal/Homicidal Ideation: The claimant reports suicidal thought without plan or intent to harm herself. Homicidal ideation was denied. Immediate Memory: Within normal limits. Recent Memory: Moderately deficient, with the claimant recalling two of the four stimulus words after a delay. Remote Memory: Within normal limits. Concentration: Mildly deficient based upon a score of 7 on the Digit Span subtest. Psychomotor Behavior: Positive for posturing and a need to move frequently related to reported physical discomfort. Task Persistence: Within normal limits. Pace: Within normal limits.

Her current medications were Zoloft, Seroquel, Trazodone, Ketoprofen, Topamax, Percocet, Mirapex, Prilosec, and Flector Patch.

The Diagnostic Rationale noted:

> The depressive disorder was made based upon her observed depressed mood, observed crying with reports of experiencing depressions and crying on a daily basis, low energy levels, feelings of frustration and lack of self-worth related to her physical being. It would appear that the depression is related to her physical disorder, however, it seems to be more severe than could be explained with an adjustment reaction.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Hood noted that Straight's prognosis was poor because she was not receiving mental health treatment. He further opined that she was competent to manage her own financial affairs.

In a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Hood found mild restrictions in understanding and remembering simple instructions, carrying out simple instructions, ability to make judgments on simple work-related decisions, in interacting appropriately with the public, supervisors, and co-workers, moderate restrictions in understanding and remembering and carrying out complex instructions, and responding appropriately to usual work situations and to changes in a routine setting, and a marked restriction in the ability to make judgments on complex work-related decisions. Hood also reported a mild to moderate impairment in memory and concentration and that, because physical factors complicated the depressed mood, a medical assessment of the physical factors and pain was needed.

## VI. STRAIGHT'S TESTIMONY

At the January 21, 2009 hearing, Straight testified that, in 2003 she was employed by Mantech as a senior accounts payable technician for a large government firm. While employed, she performed a variety of work activities ranging from the bottom

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

level to the senior accounts payable level, including working at a desk, using a computer, talking on the telephone, filing documents, packing banker's boxes, filing banker's boxes, opening and disbursing the mail, and doing check runs.

Straight stated that, currently, she could lift only one or two pounds, stand for five minutes, sit for ten minutes, and walk short distances. She further reported that she was unable to shop for groceries, do any cleaning, yard work, gardening, exercise, or any activities outside of the home, could not provide any of the care for her son, does not leave home except to go to the doctor's office, and only socializes with her mother and son. She is able to brush her teeth and use the bathroom by herself but requires assistance brushing her hair and getting dressed. She reported daily activities of spending all day in bed watching cartoons with her son, sitting on a chair to shower, and sometimes reading to her son at bedtime.

At the hearing, she reported that she had discontinued physical therapy in March 2008[1] because, in her opinion, it was not helping. She also reported having had only one appointment for

---

[1]    The medical evidence of record does not contain any reports of physical therapy.

20

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

psychiatric treatment and no psychiatric hospitalizations or doctor consultations for problems with her memory or concentration. When asked if the depression medication helped, she responded:

> No, I, no. I, I don't feel like that I, I feel, my doctors told me that I'm depressed because of my pain because I can't do the things that I used to do and because I'm trying to adjust to the disabilities and everything like that. But to me, I don't feel like I'm, you know, a basket case or, you know, so to speak...So I'm taking it [depression medication]. I'm doing it as my doctor says and taking the medicine he prescribes but I can't tell one way or the other if it's, if it's working or not because to me my mind is fully functional. It's my body that's not functional.

Significantly, at one point during her testimony at the hearing, Straight reported no problems with her hands and arms and that she was able to move her fingers and even dial the telephone. Later, however, she testified that she has no feeling in her fingers and constantly dropped her cigarettes.

## VII. <u>DISCUSSION</u>

Straight contends that, after finding that her depressive disorder was a severe mental impairment, the ALJ erred in relying on the Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, App. 2 ("grids") to deny her claim for disability benefits. In

support of her position, Straight relies on the decisions in
Barbara Biller v. Michael J. Astrue, Civil Action 2:09CV73
(N.D.W. Va. August 16, 2010) (Bailey, J.) and Mauzy v. Astrue,
Civil Action No. 2:08CV75 (N.D.W. Va. 3/30/10) (Bailey, J.). As
noted earlier, the Commissioner contends that the ALJ correctly
applied the "grids" and that Straight's case is clearly
distinguishable from those cases on which she relies. This Court
agrees.

## A.  Biller

In Biller, the Magistrate Judge based his recommendation to
remand the case on the ALJ's failure to obtain the testimony of a
vocational expert and to include all of Biller's nonexertional
limitations in his analysis regarding the jobs available in the
national economy that Biller retained the ability to perform. He
further found that the ALJ's analysis regarding Biller's
limitations was inconsistent; the ALJ determined that Biller could
work at the light exertional level, but then stated that her
postural limitations would not significantly affect the number of
jobs at the sedentary level. Because of this, the Magistrate Judge
recommended remanding the case for further development, stating he
"cannot determine whether substantial evidence would support a

22

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

finding that these limitations would not, especially in combination, erode the occupational base for a full range of light work." Biller v. Astrue, Report and Recommendation, p. 46. The Honorable John P. Bailey accepted and approved the Report and Recommendation/Opinion because the parties did not file any objections. See Wells v. Shriners Hospital, 109 F.3d 198, 199-200 (4th Cir. 1997); Thomas v. Arn,474 U.S. 140,148-153 (1985).

Here, the ALJ determined that Straight's non-exertional limitation had little or no effect on the unskilled light work occupational base. Specifically, the ALJ concluded:

> Thus, after carefully considering the entire record in this matter, including the claimant's subjective complaints, the Administrative Law Judge concludes that, based on the evidence discussed above, the claimant is limited to no more than 'light' exertional activity, as that term is defined under the regulations, with no crawling, no climbing of ladders/ropes/scaffolds, no more than occasional balancing, stooping, kneeling, crouching or climbing of ramps/stairs, and no concentrated exposure to extreme cold/heat, vibration, fumes, odors, dusts, gases, poor ventilation or hazards (machinery, heights, etc.) due to her fibromyalgia, psoriatic arthritis and obesity. In addition, the claimant is further limited to no more than simple, unskilled tasks due to her depressive disorder.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

20 C.F.R. § 404.1569(d) in pertinent part that the rules in appendix 2 will not be applied in cases where the "impairments and related symptoms such as pain, affect your ability to meet both the strength and demands of jobs other than the strength demands," unless there is a rule that directs a conclusion of disability based upon your strength limitations and otherwise will "provide a framework to guide" the decision. 20 C.F.R. pt. 404, Subpt. P, App. 2, § 200.00(e)(2) provides:

> (2) However, where an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first where a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations. Also, in those combinations of nonexertional and exertional limitations which cannot be wholly determined under the rules in this appendix 2, full consideration must be given to all of the relevant factors in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations, which will provide insight into the adjudicative weight to be accorded each factor.

In applying these regulations to Straight's case, the ALJ stated:

> In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either 'disabled' or 'not disabled' depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of 'disabled' without considering the additional exertional and/or nonexertional limitations SSRs 83-12 and 83-14. If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).
>
> If the claimant had the residual functional capacity to perform the full range of light work, considering the claimant's age, education, and work experience, a finding of 'not disabled' would be directed by Medical-Vocational rule 202.21. However, the additional limitations have little or no effect on the occupational base of unskilled light work. A finding of 'not disabled' is

therefore appropriate under the framework of this rule.

In making this determination, it is noted that the functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work, and administrative notice has been taken of the fact that approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy (20 C.F.R., Part 404, Subpart P, Appendix 2, Section 200.000(b) and 202.00; Social Security Rule 83-10).

With regard to the effect of the claimant's other non-exertional limitations on the occupational base of light occupations, it is noted that Social Security Ruling 83-14 provides that a full range of light work implies that the worker is able to do occasional bending of the stooping type. The Ruling further provides that an inability to ascend or descend scaffolding or ropes or to crawl on hands and knees has very little or no effect on the unskilled light occupational base. Moreover, Social Security Ruling 85-15 provides that where a person has a medical restriction to avoid excessive amounts of noise, dust, etc., the impact of the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc. The Ruling further indicates that a restriction from being on unprotected elevations or near dangerous moving machinery would not have a significant effect on work that exists at all exertional levels. The Ruling goes on to provide that if a person can stoop occasionally (from very

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION
_____

little up to one-third of the time) in order
to lift objects, the light occupational base
is virtually intact. Additionally, the Ruling
provides that limitations on kneeling would be
of little significance in the broad world of
work. Finally, this Ruling provides that
where a person has some limitation in climbing
and balancing, it would not ordinarily have a
significant impact on the broad world of work.

Tellingly, the ALJ noted that, despite Straight's claim of
inability to perform any household chores, and her report that her
daily activities consisted of lying down all day, watching
television or reading to her three-year-old son, and caring for her
own personal needs, her medical records contain no evidence of
muscle atrophy. The ALJ also noted that the medical records fail to
substantiate any cause for Straight's total isolation and
inactivity except her own preference. The ALJ determined that the
clinical and objective findings in the record rebut Straight's
contention that she is totally unable to perform any gainful
employment, and stated that, while her impairments may restrict
strenuous physical exertion, they do not preclude all work
activity.

In <u>Walker v. Bowen</u>, 889 F.2d 47 (4th Cir. 1989), the Fourth
Circuit held

> . . . that not every nonexertional limitation
> or malady rises to the level of a
> nonexertional impairment, so as to preclude
> reliance on the grids. Grant v. Schweiker, 699
> F.2d 189 (4th Cir. 1983). The proper inquiry
> under Grant is whether the nonexertional
> condition affects an individual's residual
> functional capacity to perform work of which
> he is exertionally capable.

In Grant v. Schweiker, 699 F.2d 189, 192, (4th Cir. 1983), our circuit court stated

> . . . once the claimant makes a prima facie
> showing of a disability that prevents his
> engaging in his prior work activity, the
> burden of going forward shifts to the
> secretary, who must show that the claimant
> retains the capacity to perform an alternative
> work activity and that this specific type of
> job exists in the national economy.
>
> The new regulations attempt to regularize
> the Secretary's decisionmaking as to this
> latter showing. They establish a sequential
> evaluation process whose fifth inquiry is
> whether the claimant is able to perform other
> work that exists in the national economy. In
> order to answer this question, the regulations
> establish 'grids' that take administrative
> notice of the availability of job types in the
> national economy for persons having certain
> characteristics, namely age, education,
> previous work experience, and residual
> functional capacity. Each grid table,
> however, only considers the strength or
> 'exertional' component of the claimant's
> disability in determining whether jobs exist
> that the claimant is able to perform in spite
> of his disability. For that reason, the

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> regulations themselves specifically provide
> that where the claimant's impairment is
> nonexertional - not manifested by a loss of
> strength or other physical abilities - or is
> marked by a combination of exertional or
> nonexertional impairments, the grids' Rules
> are not conclusive, and full individualized
> consideration must be given to all relevant
> facts of the case. In particular, the
> regulations note that individualized
> consideration must be given when nonexertional
> impairments further narrow the range of jobs
> available to the claimant, considering his
> exertional impairments. (Internal citations
> omitted.)

Later, in Smith v. Schweiker, 719 F.2d 723, 725, (4th Cir. 1984), the Fourth Circuit held

> [i]f a nonexertional condition reduces an
> individual's residual functional capacity to
> perform sedentary work, it is inappropriate to
> apply the grids because the range of jobs
> available to the impaired claimant is narrower
> than the grids would indicate. It is amply
> clear, however, that not all nonexertional
> conditions or limitations affect an
> individual's capacity to perform such work.
> Whether a given exertional condition affects a
> particular claimant's residual capacity to
> engage in certain job activities is a question
> of fact. See Cummis v. Schweiker, 670 F.2d
> 81, 84 (7th Cir. 1982) (question whether
> nonexertional condition interfered with
> ability of claimant to perform sedentary work
> was factual). We conclude that substantial
> evidence supported the ALJ's finding that the
> anxiety neurosis complained of by Mr. Smith
> did not affect his capacity to perform
> sedentary work. Thus, it was not improper to

apply the grids in determining Smith's
disability status.

In this case, after considering all of the evidence of record including Straight's subjective complaints, the ALJ concluded that she retained the ability to perform work at the light exertional level with no crawling, climbing of ladders, ropes or scaffolds, no more than occasional balancing, stooping kneeling, crouching or climbing of stairs or ramps, no concentrated exposure to extreme cold or heat, vibration, fumes, odors, dusts, gases, poor ventilation or hazards due to her fibromyalgia, psoriatic arthritis and obesity. He further determined that, due to her depressive disorder, Straight was limited to simple, unskilled tasks. The ALJ also determined that, because Straight's nonexertional limitations did not significantly erode the occupational base, the "grids" provided a framework for his decision that there were a significant number of jobs in the economy that Straight could perform, and he therefore was not required to obtain the testimony of a vocational expert.

**B. Mauzy**

In <u>Deonna M. Mauzy v. Astrue</u>, Civil Action No. 2:08-cv-75 (N.D.W. Va. 3/30/10) (Bailey, J.) the Honorable John P. Bailey,

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Chief Judge, remanded the case to the Commissioner for further

proceedings with the following instructions:

> that the ALJ consider and include all of the
> plaintiff's mental limitations in making his
> RFC; that the Appeals Council distinguish
> between the new evidence that the plaintiff
> was attempting to submit (namely Dr. Stein's
> May 11, 2007 Report) and evidence that was
> already a part of the record (namely Exhibit
> No. 15F, Consultative Examination dated
> 7/31/06 by Thomas Stein, Ed.D. and Exhibit No.
> 18 F, Medical Report from Vinoo S. Thomas,
> J.D.) and afford said new evidence proper
> consideration and treatment; and that the ALJ
> provide a sufficiently specific discussion of
> why he believes the opinion of Dr. Raines is
> entitled to very little weight. failed to
> perform a function by function analysis of the
> claimant' ability to understand, remember and
> carry out simple instructions, use judgment in
> making work-related decisions, respond
> appropriately to supervision, co-workers and
> work situations and deal with changes in a
> routine work setting.

Mauzy v. Astrue, Order Accepting in part and Rejecting In Part

Opinion/Report and Recommendation, p. 30.

SSR 96-8p provides:

> The RFC assessment is a function-by-function
> assessment based upon all of the relevant
> evidence of an individual's ability to do
> work-related activities. At step 4 of the
> sequential evaluation process, the RFC must
> not be expressed initially in terms of the
> exertional categories of 'sedentary,' 'light,'
> 'medium,' 'heavy,' and 'very heavy' work

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.

RFC may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level.

Here, at the fourth step of the sequential analysis, the ALJ determined that Straight's physical impairments did not meet or equal any of the criteria set forth in 1.00 Musculoskeletal System, 3:00 Respiratory System, 4:00 Cardiovascular System, 8.00 Skin Disorders, 12.04 Affective Disorders, or any other applicable listed impairments. Moreover, the ALJ found that Straight did not satisfy the criteria set forth in 20 C.F.R. Pt. 404, Subpt P, Appl, 12.04 Affective Disorders, which provides:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.   Medically documented persistence, either continuous or intermittent, of one of the following:

1.   Depressive syndrome characterized by at least four of the following:
a.   Anhedonia or pervasive loss of interest in almost all activities; or
b.   Appetite disturbance with change in weight; or
c.   Sleep disturbance; or
d.   Psychomotor agitation or retardation; or
e.   Decreased energy; or
f.   Feelings of guilt or worthlessness; or
g.   Difficulty concentrating or thinking; or
h.   Thoughts of suicide; or
I.   Hallucinations, delusions or paranoid thinking; or

2.   Manic syndrome characterized by at least three of the following:
a.   Hyperactivity; or
b.   Pressure of speech; or
c.   Flight of ideas; or
d.   Inflated self esteem; or
e.   Decreased need for sleep; or
f.    Easy distractability; or
g.   Involvement in activities that have a high probability of painful consequences which are not recognized; or

33

      h.  Hallucinations, delusions or paranoid thinking; or

      3.   Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); AND

      B.   Resulting in at least two of the following:
      1.   Marked restriction of activities of daily living; or
      2.   Marked difficulties in maintaining social functioning; or
      3.   Marked difficulty in maintaining concentration, persistence or pace; or
      4.   Repeated episodes of decompensation, each of extended duration . . . .

As to Straight, the ALJ specifically found:

      The claimant's mental impairment does not meet or medically equal the criteria of listing 12.04. In making this finding, the undersigned has considered whether the 'paragraph B' criteria are satisfied. To satisfy the 'paragraph B' criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompenssation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once

34

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

every four months, each lasting for at least
two weeks.

Based on the evidence set forth in detail
below under Finding Number 5, the claimant has
the following restrictions in the 'paragraph
B' criteria: in activities of daily living,
the claimant has mild restriction, in social
functioning, the claimant has mild
difficulties; with regard to concentration,
persistence or pace, the claimant has moderate
difficulties; and as for episodes of
decompensation, the claimant has not
experienced any episodes of decompensation, of
extended duration as defined in Listing 12.00.

Because the claimant's mental impairment does
not cause at least two 'marked' limitations or
one 'marked' limitation and 'repeated episodes
of decompensation, each of extended duration,
the 'paragraph B' criteria are not satisfied.

The undersigned has also considered whether
the 'paragraph C' criteria are satisfied. In
this case, the evidence fails to establish the
presence of the 'paragraph C' criteria. More
specifically, as the 'C' criteria of Listing
12.04, there is no evidence that the claimant
has experienced repeated episodes of
decompensation of an extended duration. There
is also no evidence of a residual disease
process resulting in such marginal adjustment
that even a minimal increase in mental demands
or changes in the environment would cause an
episode of decompensation. Moreover, there is
no evidence of an inability to function
outside of a highly supportive living
arrangement. Indeed, the evidence shows that
the claimant has never required any
hospitalization for a mental impairment. In
addition, the evidence shows that the claimant

> is able to care for the majority of her own
> personal needs independently, sleep in the
> same room with and look after, her three-year-
> old son each night, and leave her home to go
> grocery shopping and to doctor's appointments
> (Exhibit 10E; Testimony).  Accordingly, the
> evidence fails to establish that the
> claimant's mental impairment meets the 'C'
> criteria of 12.05.

Thus, it is clear that, unlike the ALJ in <u>Mauzy</u>, here the ALJ did perform a function by function evaluation before determining that Straight could not perform her past relevant work, but did retain the ability to perform light work with the listed restrictions.

## VIII. <u>CONCLUSION</u>

Straight has not raised any issues that were not thoroughly considered by Magistrate Judge Joel in his R&R. Moreover, the Court, upon an independent <u>de novo</u> consideration of all matters now before it, is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances before the Court in this action. It therefore **ORDERS** that Magistrate Judge Joel's R&R be accepted in whole, and further **ORDERS** that this civil action be disposed of in accordance with the recommendation of the magistrate judge.  Accordingly,

1.    The defendant's motion for Summary Judgment (Docket No.

12) is **GRANTED**;

36

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

2.    The plaintiff's motion for Summary Judgment (Docket No.

      10) is **DENIED**; and

3.    This civil action is **DISMISSED WITH PREJUDICE** and **RETIRED**

      from the docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of
Court to enter a separate judgment order and to transmit copies of
this Order to counsel of record.

DATED: March 28, 2011.


                                  /s/ Irene M. Keeley
                                  IRENE M. KEELEY
                                  UNITED STATES DISTRICT JUDGE